IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

DAVID LOZANO,

                         **Plaintiff,**

-vs-                                                                     **Case No.  A-09-CA-200-SS**

CITY OF AUSTIN, OFFICER BOUDREAU, and OFFICER
DEATON, SUPERVISOR, in Their Official and Individual
Capacities,

                         **Defendants.**

_____

# O R D E R

BE IT REMEMBERED on this day the Court reviewed the file in the above-styled cause, and specifically the Defendants City of Austin, Officer Boudreau, and Officer Deaton's (collectively, "Defendants") motion for summary judgment [#61], Plaintiff David Lozano's ("Plaintiff") response, Defendants' reply [#71], and Plaintiff's sur-reply [#74]; Defendants' motion to exclude the testimony of Plaintiff's expert [#70], and Plaintiff's response thereto [#77]; Defendants' motion to strike response in opposition (Docket No. 68) [#72], and Plaintiff's response [#75]; Plaintiff's motion to strike reply to response (Docket No. 71) [#76], and Defendants' response [#81], and Defendants' motion to strike response in opposition (Docket #74) [#80], to which no response has been timely filed.  Having considered the aforementioned documents, the case file as a whole, and the applicable law, the Court enters the following opinion and orders.

## Background

Plaintiff brings this suit against the City of Austin; Austin Police Department ("APD") Officer Roger Boudreau, in his official capacity only; and APD Sergeant Stephen Deaton, Boudreau's immediate

supervisor, in his official capacity only.  2nd Am. Compl. at ¶¶ 2-4.  Plaintiff claims he was shot and

severely wounded as a result of Defendants' violations of his constitutional rights.

## I.      The Parties' Allegations[1]

On March 21, 2007, a man named Miguel Salazar ("Salazar") called 911 to report a domestic

violence dispute at Plaintiff's address.  It is undisputed Salazar had previously had an affair with Plaintiff's

wife, Rosemary Lozano ("Rosemary").   The transcript of the 911 call indicates Salazar told the 911

dispatcher that Rosemary had "called [him] asking for help."   *See* Def.'s Mot. Summ. J. at Ex. 11 ("911

Tr.").  Salazar gave Plaintiff's name and address to the dispatcher, and stated "I believe he has a lot of guns

in his house, from what [Rosemary] told me... So you all, you ought to be careful."  *Id.*  He also stated "I

believe he might be high on marijuana," referring to Plaintiff.  *Id.*  Salazar gave the dispatcher his name and

contact information, and asked the dispatcher to "let me know if [Rosemary]'s all right."  *Id.*

Plaintiff disputes Salazar's version of the events leading up to the 911 call, although he does not

dispute that the call was made.  Plaintiff claims Salazar had called ***his*** phone earlier that night, and had

threatened him. Pl.'s 2nd Am. Compl. at ¶ 7.  Plaintiff was aware Salazar and his wife had been having an

affair, and Plaintiff alleges he saw the call was coming from "Yager Food Store," which is about three

blocks from his home.[2]  *See* Def.'s Mot. Summ. J., Ex. 13 ("Pl.'s Depo.") at 56.  Plaintiff claims the caller

said "I'm going to kill you."  *Id.*   Plaintiff alleges he suspected the caller was Salazar, and thus he woke

---

[1]The following facts are undisputed except as specifically indicated.

[2]Defendants note this assertion is belied by the fact Plaintiff's telephone records show no calls to Plaintiff from "Yager Food Store" on the night in question.  Def.'s Mot. Summ. J., Ex. 15 (Plaintiff's phone records).  Likewise, Salazar stated on the night of March 21, 2007 (in a statement to APD after the events of that night), that it was Plaintiff who called harassing him—not the other way around.  *Id.*, Ex. 14 (Salazar's statement to APD).  Salazar stated he got a call from Rosemary's phone on his Nextel walkie-talkie, and when he heard it was a male voice, he realized it must be Plaintiff, rather than Rosemary.  *Id.*  He claims he realized Plaintiff must have taken the phone away from Rosemary, and Salazar claims he said into the phone "David, you better not hurt her."  *Id.*  Salazar claims he told Plaintiff that if he did not let him talk to Rosemary, he would call the police.  *Id.*  Plaintiff turned Rosemary's phone off, and Salazar called 911, as he had promised.  *Id.*  Salazar claims he feared for Rosemary because Plaintiff and Rosemary had had domestic violence disputes previously, and Salazar was aware of this fact.  *Id.*

-2-

his wife up and got her Nextel walkie-talkie cell phone.  *Id.*  He clicked on Salazar's name and said "Hey,"

and he claims a man's voice responded, "I'm gonna kill you, m****r f****r."  *Id.* at 57.  At about this time,

Plaintiff heard a knock on the door.  *Id.*  Plaintiff claims he believed this was Salazar knocking, although

it was actually an APD officer, responding to the 911 call placed by Salazar.

Officer Boudreau responded to the 911 call of family disturbance at Plaintiff's address while he was

on patrol on the night of March 21, 2007.  Defs.' Mot. Summ. J. [#61] at Ex. 1 ("Boudreau Aff.").  The 911

dispatcher radioed the call as a "Priority 1," and informed Boudreau there was a "struggle" going on, "lots

of guns," and the suspect was "possibly high on marijuana."[3]  *Id.* at ¶ 5.  At the time, Boudreau was driving

a marked police car and was dressed in full uniform: navy pants with two red stripes down each leg; navy

shirt with red APD patches on the sleeves; a silver APD badge, a silver name tag, and a radio on his shirt;

and a black baseball cap with a red APD patch on front and a reflector stripe on the bill.  *Id.* at ¶ 6; Att. 1

(picture of Boudreau taken on the night in question).  He was carrying a Glock Model 22 .40 caliber semi-

automatic weapon with a fully-loaded magazine of 15 rounds.  *Id.* at ¶ 6.

When Officer Boudreau arrived at Plaintiff's house, he parked two houses away from the house "for

safety reasons," and activated his in-car camera and lapel microphone.  Boudreau Aff. at ¶ 6.  He "beeped"

dispatch to notify that he was on the scene.  *Id.*  Although he had back-up on the way, he proceeded to walk

up to the residence without back-up; he states in his affidavit "officers are not required to wait for back-up

on calls...because that would delay response time when citizens may need immediate help."  *Id.* at ¶ 5.

Officer Boudreau approached Plaintiff's front door, listened, and then attempted to peer into the front

window, although he was unable to see anything because of a curtain.  *Id.* at ¶ 7.  He could see a light was

---

[3]Boudreau testified in his deposition "Priority 1" indicates the call is "urgent," and is generally used when a gun is involved.  Def.'s Mot. Summ. J., Ex. 4 ("Boudreau Depo.") at 37.

on. *Id.*  He knocked, listened, and then knocked again.  *Id.*  Officer Boudreau did not announce himself as an APD officer before or during the time he was knocking.  *Id.* at ¶ 8.  He states in his affidavit that "[o]fficers don't have to announce before knocking so that residents have an opportunity to respond without escalating a situation with concerns about police presence[.]"  *Id.*  He states officers are "trained to use their discretion" on this issue.  *Id.*

After receiving no answer to his repeated knocks, Officer Boudreau states he was about to knock louder and announce when he heard the unmistakable slide of a semi-automatic weapon chambering a round on the other side of the door.[4]  *Id.*  Officer Boudreau states it was a distinct and recognizable sound to him, as he is a former military officer and a police officer trained in weapons.[5]  *Id.* at ¶ 9.

Thinking he was "about to be shot and killed through the door," Officer Boudreau "immediately retreated," jumping off the porch and taking the closest possible cover behind a beam supporting the porch roof.  *Id.* at ¶ 10.  He was only five feet from the door at that point, but he states he was "as far as [he] could safely withdraw without turning [his] back, losing visual, and risking a bullet in the back."  *Id.*  At this point, Officer Boudreau did not immediately announce himself as a police officer for fear of giving away his position without adequate cover from gunfire.  *Id.*  He states he had "no idea" why the suspect had threatened him with a gun, but he assumed it was because he was a police officer.  *Id.*

---

[4]Plaintiff does not dispute the veracity of Officer Boudreau's statement that he clearly heard a round being chambered on the other side of the door.  In fact, in his original complaint Plaintiff specifically admitted that after he heard the knocks at the door he "retrieved a handgun from the closet and slid the mechanism from the gun right next to the door hoping that who he thought was Mr. Salazar would hear the gun and move away from the door so that he would not get shot when he looked through the peephole."  *See* Compl. [#1] at ¶ 11.  Likewise, Plaintiff testified in his deposition that after he heard the knocks, he "grabbed a gun and chambered a round."  Pl.'s Depo. at 58.

[5]Officer Boudreau had spent 11 years in the United States Air Force as a Security Forces Officer before becoming an APD officer.  Boudreau Aff. at ¶ 15.

Plaintiff states that after grabbing his gun and chambering a round, he took a quick look through the peephole and didn't see anything. *See* Pl.'s Resp. [#68] at 5. Plaintiff admits he was "really scared," and "went into survival mode." Pl.'s Depo. at 58. He opened the front door with his left hand, holding the gun with his right. *Id.* Plaintiff claims the gun was pointing downward, and he made no explicit threat. *Id.* As the door opened, Officer Boudreau shouted something to the effect of "Let me see your—" before gunfire erupted.[6] Boudreau Aff. at ¶ 11.

Reports differ over who fired first. Plaintiff claims it was Officer Boudreau. Pl.'s Depo. at 59. Plaintiff's wife, in her written statement to police about the shooting stated she is "sure that [Plaintiff] shot first[.]" Def.'s Mot. Summ. J., Ex. 12. Officer Boudreau, for his part, states Plaintiff shot first: he testifies he "saw a muzzle flash, and had the sensation of a bullet whizzing past [his] right ear[.]" Boudreau Aff. at ¶ 12. He states he made eye contact briefly with Plaintiff, whom he identified as a Hispanic male, and then fired in his direction.[7] *Id.* Officer Boudreau radioed "602 SHOTS FIRED" and then withdrew, running into the yard beside the house. *Id.* He testifies he was looking for an escape, or at least adequate cover from the gunman. *Id.*

Plaintiff chased Officer Boudreau into the yard with his gun, yelling repeatedly (as is audible on the lapel microphone audio tapes) in English in Spanish, "Puto, puto, come on m****r f****r!" *Id.* at ¶ 13. Officer Boudreau states Plaintiff was "right on [him]," and he realized he had no cover in the yard. *Id.*

---

[6]Although Plaintiff claims "[t]here was not any verbal announcement or visual identification of police presence by Officer Boudreau," he does not dispute Officer Boudreau was in full uniform, or that the audio tape of the incident indicates Boudreau was yelling something to the effect of "Let me see your hands" right before the first shots were fired. *See* Def.'s Mot. Summ. J., Ex. 6 at Track 3 (enhanced lapel microphone audio).

[7]Officer Boudreau testifies he is aware Plaintiff contends that Boudreau fired first, and with respect to this allegation he states "I can only relay the facts as I remember them, and that is how I have reported the facts to this day. I understand that my memory may differ because I was in fear of my life, but I would not have fired while I was already announcing unless the suspect did something to cause me to fire when he was opening the door." Boudreau Aff. at ¶ 17. He states correctly that he reported that Plaintiff shot first within seconds of the gunfire ensuing (into his lapel microphone), and has so stated in all his subsequent testimony about the incident. *Id.* at ¶ 18.

Therefore, Officer Boudreau turned and stood next to the chimney at the side of the house, with almost no cover, as the two exchanged gunfire. *Id.* Because it was dark in the yard, he was shooting at Plaintiff's muzzle flash. *Id.* Plaintiff shot at Officer Boudreau three times, but did not hit him; Officer Boudreau, however, hit Plaintiff twice, and he went down. *Id.* Officer Boudreau yelled again "Let me see your hands!" but Plaintiff did not drop his weapon. *Id.* Instead, Plaintiff fled into the house. *Id.*

At the end of the gunfight, Officer Boudreau had seven bullets remaining, but states he chose not to continue shooting once he saw Plaintiff had gone down. *Id.* at ¶ 14. Officer Boudreau testifies he had never shot anyone before, nor even fired at anyone. *Id.* at ¶ 15. As Plaintiff fled into the house, Officer Boudreau ran across the street and took cover behind a parked car, where he remained until APD arrived. *Id.* at ¶ 16. Officer Boudreau testifies that at this point he could not "fathom [Plaintiff] did not know I was an officer," because the two had looked into each other's eyes, Boudreau believed he had announced twice (right before and during the gunfight), and he was in full uniform with a reflector on the bill of his cap which could be seen at night. *Id.* at ¶¶ 15, 20. He states there was "sufficient lighting from the garage light at the front door for me to see that [Plaintiff] was a Hispanic male, so I had reasonable expectation that [Plaintiff] saw that I was a uniformed officer." *Id.* at ¶ 21.

Once Plaintiff was inside his house, he called 911 and told the 911 dispatcher that he had been shot. *See* 911 Tr. at 6. The 911 dispatcher told him police were already present at the scene, and when he crawled to the door and opened it he was immediately taken into custody by APD officers. Plaintiff ultimately had to have his leg amputated based on the gunshot wounds he received from Officer Boudreau, and also claims he faced "false criminal charges" that were not dismissed until after more than a year of incarceration. Pl.'s 2nd Am. Compl. at ¶ 10.

## II.   Procedural History

Plaintiff filed the instant case on March 20, 2009, bringing claims under 42 U.S.C. § 1983 against Defendants Officer Boudreau, Officer Deaton, and the City.  Plaintiff claims Officer Boudreau's actions constituted a deprivation of Plaintiff's Fourth Amendment right to be free of unreasonable searches and seizures.[8]  *Id.* at ¶ 13.  Plaintiff also asserts a supervisory liability claim against Officer Deaton and the City under 42 U.S.C. §§ 1981, 1983 and 1984, claiming these Defendants deprived him of his constitutional right to be free of unreasonable searches and seizures under the Fourth Amendment and his constitutional right to equal protection under the Fourteenth Amendment (because the "custom pattern and practice for handling this situation is different in [Plaintiff's] neighborhood than in other neighborhoods").  *Id.* at ¶¶ 13, 16.  Specifically, he claims Officer Deaton (Boudreau's immediate supervisor) and the City knew Officer Boudreau had prior repeated incidents of violation of APD's rules, but nevertheless made a conscious decision not to train and correct his actions and acted with deliberate indifference to the rights of citizens in so doing.  *Id.* at ¶ 11.  He also asserts Officer Deaton and the City ratified Boudreau's actions by later giving him a medal of honor on the basis of the incident that is the basis of this lawsuit.  *Id.* at ¶ 17.  Plaintiff seeks compensatory and exemplary damages.  *Id.* at ¶¶ 18-19.

On December 12, 2009, this Court entered an order granting in part and denying in part Defendants' motion to dismiss.  *See* Dec. 12, 2009 Order [#38].  The Court granted Defendants' motion to dismiss in the following respects: (1) as to any claim against Officer Deaton for improper dispatch, (2) as to Plaintiff's claim, if any, "that the City of Austin is liable for establishing an unconstitutional policy or custom which resulted in the constitutional violation in question," (3) as to Plaintiff's ratification claim, (4) as to any claim

---

[8]Plaintiff also alleges Officer Boudreau intentionally misrepresented the facts of his encounter with Plaintiff in his sworn statement after the incident—specifically, that Officer Boudreau claimed after the incident Plaintiff shot first, although (according to Plaintiff) the crime scene photos, audio experts, and APD ballistics and crime scene experts all reveal Officer Boudreau shot first, *id.* at ¶ 11—although it is unclear whether Plaintiff seeks to base a cause of action on this allegation.

for discrimination under § 1981, and (5) as to any claim of conspiracy under § 1985(3).  *Id.*  The Court also

reiterated the requirements of Federal Rule of Civil Procedure 11, and stated: "[e]ach of Plaintiff's counsel

is hereby expressly warned he will be subject to sanctions if the Court later determines there was no basis in

law or fact for this lawsuit against any one of the Defendants."  *Id.*

 With these background facts in mind, the Court turns to the presently pending motions.

**Analysis**

## I. Defendants' Motion for Summary Judgment [#61]

### A. Legal Standard for Summary Judgment

 Summary judgment may be granted if the moving party shows there is no genuine issue of material

fact, and it is entitled to judgment as a matter of law.  FED. R. CIV. P. 56(c).  In deciding summary

judgment, the Court construes all facts and inferences in the light most favorable to the nonmoving party.

*Richter v. Merchs. Fast Motor Lines, Inc.*, 83 F.3d 96, 98 (5th Cir. 1996).  The standard for determining

whether to grant summary judgment "is not merely whether there is a sufficient factual dispute to permit

the case to go forward, but whether a rational trier of fact could find for the nonmoving party based upon

the record evidence before the court."  *James v. Sadler*, 909 F.2d 834, 837 (5th Cir. 1990).

 Both parties bear burdens of production in the summary judgment process.  *Celotex Corp. v. Catrett*,

477 U.S. 317 (1986).  The moving party has the initial burden of showing there is no genuine issue of any

material fact and judgment should be entered as a matter of law.  FED. R. CIV. P. 56(c); *Celotex*, 477 U.S.

at 322–23; *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986).  The nonmoving party must then

come forward with competent evidentiary materials establishing a genuine fact issue for trial, and may not

rest upon mere allegations or denials of its pleadings.  *Anderson*, 477 U.S. at 256–57; *Matsushita Elec.*

*Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986).  Neither "conclusory allegations" nor

-8-

"unsubstantiated assertions" will satisfy the non-movant's burden.  *Wallace v. Tex. Tech Univ.*, 80 F.3d 1042, 1047 (5th Cir. 1996).

### B.   Plaintiff's Claim Against Officer Boudreau

First, Plaintiff claims Officer Boudreau violated his constitutional right under the Fourth Amendment to be free from unreasonable searches and seizures.  2nd Am. Compl. at ¶ 13.

#### (a) Legal standard

In addressing an excessive force claim brought under § 1983, the Court's analysis "begins by identifying the specific constitutional right allegedly infringed by the challenged application of force." *Graham v. Connor*, 490 U.S. 386, 394 (1989).  The Supreme Court has stated "there can be no question that apprehension by the use of deadly force is a seizure subject to the reasonableness requirement of the Fourth Amendment."  *Tennessee v. Garner*, 471 U.S. 1, 7 (1985).  Because this case involves the alleged use of deadly force, the constitutionality of the challenged application of force should therefore be analyzed under the Fourth Amendment and its "reasonableness" standard.  *Graham*, 490 U.S. at 395.

It is clearly established law in the Fifth Circuit that in order to state a claim for excessive force in violation of the Constitution, a plaintiff must show "(1) an injury, (2) which resulted directly and only from the use of force that was clearly excessive, and (3) the excessiveness of which was clearly unreasonable." *Manis v. Lawson*, 585 F.3d 839, 843 (5th Cir. 2009).  In this case, there is no dispute Plaintiff was injured by the use of force; thus, the only remaining question is whether the degree of force was constitutionally impermissible—that is, whether it was objectively unreasonable under the circumstances.  *Bush v. Strain*, 513 F.3d 492, 501 (5th Cir. 2008).

Determining whether the force used to effect a particular seizure is "reasonable" under the Fourth Amendment requires "a careful balancing of the nature and quality of the intrusion on the individual's

Fourth Amendment interests against the countervailing governmental interests at stake." *Graham*, 490 U.S. at 396. "The test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application." *Id.* (quoting *Bell v. Wolfish*, 441 U.S. 520, 559 (1979)). Instead, "its proper application requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* The Court in *Graham* explained the necessary perspective in evaluating a police officer's use of force:

> The "reasonableness" of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight... The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation.

*Id.* at 396-97. Thus, the reasonableness of an officer's conduct must be judged "objectively," without reference to his subjective intent or motivation. *Id.* The court must measure the force used under the facts as a reasonable officer would perceive them, not necessarily against the historical facts.[9] *See Reese v. Anderson*, 926 F.2d 494, 501 (5th Cir. 1991). The Fifth Circuit has concluded a district court may find there is no constitutional violation as a matter of law and grant summary judgment where it finds the officer's conduct—even viewed in the light most favorable to the plaintiff—is reasonable as a matter of law, such that "no rational jury could find that the officer acted unreasonably." *Lytle v. Bexar County, Tex.*, 560 F.3d 404, 411 (5th Cir. 2009). The present case is exactly such a case.

_____

[9]For this reason, the background section of this order focuses almost entirely on facts that would have been perceived by Officer Boudreau on the night of March 21, 2007, and spends less time discussing the facts which were purportedly perceived by Plaintiff on the night of the shooting. Although Plaintiff spends much of his response arguing over what *he* knew or did not know on the night of the shooting, the facts perceived by Plaintiff are irrelevant to the analysis of whether Officer Boudreau's use of force was reasonable under the circumstances as Officer Boudreau knew them to be, although they might be relevant to—for instance—a claim of assault against Plaintiff. Therefore, the Court intentionally does not get bogged down in Plaintiff's version of why he had a gun and who threatened who (between him and Salazar), but instead focuses on those facts which were known or perceived by Officer Boudreau on the night in question.

**(b)  The shots fired on the porch**

The first set of shots was fired on the porch.  It is unclear whether Plaintiff fired at that point, but it is clear that Officer Boudreau fired at least twice.  *See* Boudreau Depo. at 73-74.  Describing the encounter in his affidavit, Officer Boudreau stated the following under oath:

> From the instant I heard [Plaintiff] chambering a round, my actions were all in self defense in fear of my life.  I responded to the threat of deadly force with deadly force as officers are trained to do, and any reasonable officer would do to save his life.  I retreated from the threat two times, but the suspect kept advancing with a loaded gun, and verbal threats.  I had no choice but to defend myself from an armed gunman, as any reasonable officer would do.

Boudreau Aff. at ¶ 22.  Considering the facts available to Officer Boudreau at the time he fired the shots on the porch, the Court finds the following facts are undisputed: Officer Boudreau was responding to a report of domestic violence at Plaintiff's address, and was on notice the suspect had "lots of guns," and was "possibly high on marijuana."  Boudreau Aff. at ¶ 5.  He knocked repeatedly on the door, in full uniform, and then heard the sound—which was distinct and unmistakable to him—of a bullet being chambered in semi-automatic weapon directly on the other side of the door.  Plaintiff has admitted he did this "hoping that [the person knocking] would hear the gun and move away from the door," *see* Compl. at ¶ 11—in other words, he intended the sound to be threatening.  It is undisputed Officer Boudreau perceived that threat clearly, and instantly jumped off the porch in an attempt to find cover.  As he was doing so, Plaintiff opened the door carrying a loaded gun.

The situation Officer Boudreau faced on the night of March 21, 2007 was the epitome of that described by the Supreme Court in *Graham*—"tense, uncertain, and rapidly evolving."  490 U.S. at 397. Based on the foregoing, the Court finds Officer Boudreau's use of deadly force was reasonable in response to the threat he faced, as he reasonably believed Plaintiff posed a threat of serious harm to his life at the moment he opened the door.  *See Mace v. City of Palestine*, 333 F.3d 621, 624 (5th Cir. 2003) (holding the

-11-

"[u]se of deadly force is not unreasonable when an officer would have reason to believe that the suspect poses a threat of serious harm to the officer or others.").  The Fifth Circuit has found an officer's use of deadly force to be reasonable when a suspect moves out of the officer's line of sight such that the officer could reasonably believe the suspect was reaching for a weapon, even where it is ultimately discovered the suspect was unarmed.  *See, e.g. Ontiveros v. City of Rosenberg, Tex.*, 564 F.3d 379, 385 (5th Cir.2009); *Reese v. Anderson*, 926 F.2d 494, 501 (5th Cir. 1991); *Young v. City of Killeen, TX.*, 775 F.2d 1349, 1352-53 (5th Cir.1985).  In this case, Officer Boudreau reasonably (and correctly) believed the suspect was armed, had threatened him with the sound of a bullet being chambered, and was proceeding out the door with his gun toward Officer Boudreau.  There is no doubt, considering the foregoing law, that Officer Boudreau had reason to believe Plaintiff posed an immediate and serious threat to his life at that moment.

Although Plaintiff argues it was Officer Boudreau, not he, who actually shot first after Plaintiff opened his front door, the question is irrelevant.  There is no rule of law which requires police officers to wait for armed suspects to fire the first shot in order for them to reasonably use deadly force in response; in fact, such a rule would have disastrous implications for the safety of police officers.  Indeed, the Fifth Circuit has specifically stated the "Fourth Amendment does not require police officers to wait until a suspect shoots to confirm that a serious threat of harm exists." *Ramirez v. Knoulton*, 542 F.3d 124, 130 (5th Cir. 2008) (quoting *Elliott v. Leavitt*, 99 F.3d 640, 643 (4th Cir. 1996)).  The suggestion that any such rule should be the law is "more reflective of the 'peace of a judge's chambers' than of a dangerous and threatening situation on the street." *Id.*

Likewise, Officer Boudreau was not required to "announce" himself as an APD officer before he shot.  In *Garner*, the United States Supreme Court defined the circumstances under which the use of deadly force to stop a fleeing suspect is constitutionally reasonable.  471 U.S. at 11-12.  The Court held "if the

suspect threatens the officer with a weapon ... deadly force may be used if necessary to prevent escape, and if, **where feasible**, some warning has been given." *Id.* (emphasis added).  This reasoning applies equally where deadly force is used to stifle a threat to the life of a police officer, *Stroik v. Ponseti*, 35 F.3d 155, 159 (5th Cir.1994)—deadly force does not **require** a warning or an announcement, although one should be given "where feasible."  In this case, Officer Boudreau was in the process of knocking when he heard the slide or racking of a semi-automatic weapon on the other side of the door.  He took this as a clear threat to his life.  He stated under oath that after that moment he feared for his life, and did not want to give away his position to a potential shooter because he did not have adequate cover from gunfire.  Boudreau Aff. at ¶ 9.  Officer Boudreau made the split-second decision that announcing himself as a police officer was not feasible until he discovered what the intentions were of the armed person behind the door.[10]  *See* Boudreau Depo. at 69 (Boudreau testifying that "when you knock on the door and you hear [a bullet being chambered] you're not going to say, 'Hey, Austin police,' because I don't know what his intentions were.  I'm going to get off that porch and find a place of cover and reevaluate the situation.").  That determination appears to have been reasonable, and within his discretion under APD policy.

Finally, even if Officer Boudreau was in violation of APD policy by (1) parking away from Plaintiff's house, (2) failing to announce himself as he knocked on the door, or (3) failing to wait for back-up (as Plaintiff claims), these violations do not equate to a constitutional violation as long as he had a reasonable belief that Plaintiff posed a threat of serious harm. *Ramirez v. Knoulton*, 542 F.3d 124, 130 (5th Cir. 2008) (holding that "[e]ven where an officer acts negligently and contrary to police procedure, [the Fifth Circuit] has failed to recognize a constitutional claim where a police officer used deadly force in

---

[10]As stated above, it appears from the audio tapes that Officer Boudreau did yell, either right before or during the shooting on the porch, "Let me see your – !".  But because this Court has an obligation to take every disputed fact in the light most favorable to Plaintiff, the Court assumes the command was made practically simultaneously with the firing of the first shots, such that Plaintiff had not heard any announcement prior to the shooting.

response to a reasonable belief that an individual posed a threat of serious harm."). Because Officer Boudreau had such a belief, Plaintiff's allegations that he violated various points of APD policy are irrelevant.

Further, and perhaps more importantly, Plaintiff's allegations that Boudreau violated APD policy are also wholly unsupported by the record. Defendants present ample evidence that APD officers are trained not to park too close to a scene, but to park away from their destination address and approach it on foot. *See* Def.'s Mot. Summ. J., Ex. 16 (copy of APD "Patrol Procedures," which warn officers about "silhouetting" and "parking [their patrol] unit too close to [the] scene," and directs officers to "[a]lways park away from your CFS and walk in," as it "[a]llows you to see/hear/smell what's going on before your [sic] too close to the call," and to "[a]nticipate [the] address and park prior to reaching it."); *and see* Ex. 8 ("Deaton Aff.") (stating "[o]fficers are trained not to park immediately in front of a house for safety reasons."). Likewise, Defendants present evidence APD officers are trained that back-up does not have to arrive before proceeding to handle a call because many calls can be handled by one officer, and requiring officers to wait for back-up to arrive would "significantly delay [APD] response time," and would not "get officers to the scene [as soon as possible] when a citizen needs immediate assistance." Deaton Aff. at ¶ 8; *and see* APD Patrol Procedures (stating officers responding to a crime in progress should "[w]ait for back-up *if necessary*.") (emphasis added). Finally, Defendants also present evidence APD officers are trained to announce only if it is "reasonable to do so," and the warning "will not significantly increase the danger to the officer." Deaton Aff. at ¶ 12. Notably, Plaintiff does not dispute any of this evidence of normal APD procedures that is submitted by Defendants. Instead, Plaintiff merely repeats the conclusory assertion that Officer Boudreau acted in violation of APD procedures, without providing a single specific citation to any procedure which Boudreau allegedly violated. Thus, the Court finds Plaintiff has not raised a genuine issue

-14-

of material fact as to whether Officer Boudreau violated APD procedures on the night of March 21, 2007—based on the evidence in the record, he did not.

Considering all the foregoing, the Court finds that even adopting Plaintiff's characterization of the facts in all respects, it is clear the shots fired by Officer Boudreau on the porch did not constitute a constitutional violation on his part.  He reasonably believed Plaintiff posed a threat of imminent danger to his life, and he was therefore reasonable in responding with deadly force.

### (c)  The shots fired in the yard

The second round of shots fired by Officer Boudreau occurred after Plaintiff undisputedly followed him off the porch into the yard yelling (as is audible on the microphone lapel audio tapes) obscenities at him in English and Spanish.[11]  At this point, Officer Boudreau had retreated to the yard to seek cover, was being pursued by Plaintiff (who was carrying a loaded gun), and was trapped in the yard with no means of escape.  Again, it does not matter who shot first—even if it was Officer Boudreau, he was imminently and undeniably reasonable in determining Plaintiff posed a threat of serious harm to him.  Indeed, it is undisputed Plaintiff emptied his gun while in the yard by firing three shots at Officer Boudreau, although he failed to hit him.  Officer Boudreau believed at that point that Plaintiff knew he was a police officer—indeed, he stated he "could not fathom" that Plaintiff did not know this after seeing him in full uniform and hearing him say "let me see your hands"—and thus he believed he was dealing with a highly aggressive suspect who was willing to shoot a police officer.  Officer Boudreau fired at Plaintiff until he

---

[11] In Plaintiff's original complaint, he admitted "[a]fter the first two shots Officer Boudreau ran around the house [and Plaintiff]...followed him."  Compl. at ¶ 13.  In his deposition, however, Plaintiff refused to admit he "followed" or "chased" Boudreau with a gun, instead stating that he "wasn't following him[, he] was just going towards the direction that [Boudreau] went[.]"  Pl.'s Depo. at 95.  This semantic splitting of hairs does not give rise to a genuine factual dispute—it is clear from Plaintiff's testimony that Boudreau ran around the side of the house and Plaintiff proceeded after him, "in the direction that he took," carrying a loaded gun.  *Id*. at 94-95.

went down, at which point he ceased firing (with seven bullets remaining in his gun), and again commanded Plaintiff, "Let me see your hands!" Plaintiff ignored this command, and fled into the house.

Even taking all the facts in the light most favorable to Plaintiff, the Court finds it is imminently clear Officer Boudreau reasonably believed at the time he fired shots at Plaintiff in the yard that Plaintiff posed a threat of imminent danger to his life; therefore, Officer Boudreau was reasonable in using deadly force against him. Although there is no doubt Plaintiff has a Fourth Amendment right to be free from unreasonable search and seizure, the circumstances outlined in the present case cannot be characterized as "unreasonable" under the legal standards outlined above.

The Court is cognizant of the fact that what happened on the night of March 21, 2007 was a horrible tragedy, which is all the more horrible because it quite possibly could have been avoided. However, it was Plaintiff, not Officer Boudreau, who could have and should have prevented this tragedy. If Plaintiff had remained inside his home instead of coming outside with a loaded weapon, he would not have been fired upon by Officer Boudreau on the porch. *See* Boudreau Aff. at ¶ 22. If Plaintiff had not chased Officer Boudreau into the yard with the loaded gun, yelling verbal threats, he would not have been fired upon (and hit) by Officer Boudreau in the yard. *Id.* If Plaintiff had responded to Salazar's alleged telephone threats by calling 911, instead of acting as he did, the entire incident could have been avoided. *Id.* Instead, Plaintiff chose to come out of his house with a loaded gun and escalate a tense, uncertain, and dangerous situation. Although he argues he did not know he was confronting a police officer, and thus his acts were misinterpreted, "no right is guaranteed by federal law that one will be free from circumstances where he will be endangered by the misinterpretation of his acts." *Young v. City of Killeen, Tex.*, 775 F.2d 1349, 1353 (5th Cir.1985). If Plaintiff were a slightly better shot, or had not run out of bullets, Officer Boudreau might well have been killed or seriously injured in the course of performing his duty.

-16-

Therefore, the Court finds as a matter of law that Plaintiff has raised no genuine dispute about whether Officer Boudreau's use of deadly force—both on the porch and in the yard—was reasonable under the Fourth Amendment.  Considering all the facts and circumstances of this particular case, the Court finds no reasonable jury could conclude the force used by Officer Boudreau was not reasonable.  Therefore, Defendants' motion to dismiss is GRANTED as to all claims against Officer Boudreau.[12]

### C.       Plaintiff's Claims against Sergeant Deaton and the City

Plaintiff argues he has raised a genuine issue of material fact on his claim against Officer Deaton because he has raised a genuine issue of material fact that Deaton "failed to supervise or train...Officer Boudreau, ...there is a casual link between the failure to train or supervise and the violation of Plaintiff's rights; and...the failure to train or supervise was done with deliberate indifference."  Pl.'s Resp. at 9.  Plaintiff also argues he has raised a genuine issue of material fact on his claim against the City as to "(1) the obvious need for more or different training, as indicated by repeated violations of protocols regarding awaiting arrival of back-up officers and announcing police presence; the City policymakers though aware of the repeated failures to follow protocol have been deliberately indifferent and refused to implement further training to correct the failures; and (3) the failure to follow the protocols...creates risks that likely le[d] to violations of constitutional rights as in the present case."  *Id.* at 10-11.

_____

[12]Furthermore, to the extent Plaintiff attempts to base a § 1983 claim on his conclusory allegation that Officer Boudreau intentionally misrepresented the facts of his encounter with Plaintiff in his sworn statement after the incident, 2nd Am. Compl. at ¶ 11, Plaintiff fails to state a claim upon which relief can be granted and judgment is proper for Defendants.  Under the provisions of 42 U.S.C. § 1983, a plaintiff must show an abuse of government power that rises to a constitutional level in order to state a cognizable § 1983 claim.  *Love v. King*, 784 F.2d 708, 712 (5th Cir. 1986); *Williams v. Kelley*, 624 F.2d 695, 697 (5th Cir. 1980).  In this case, even if it is true Officer Boudreau made false statements in his sworn statement, Plaintiff has not alleged or presented any evidence indicating he was injured in any way by such statements, much less that his constitutional rights were violated.  Even if the sworn statement was used in any judicial (or quasi-judicial) proceeding against Plaintiff (which he does not allege), a police officer has absolute immunity from § 1983 perjury claims when testifying in any adversarial judicial proceeding (such as a pre-trial proceeding).  *See Moore v. McDonald*, 30 F.3d 616, 620 (5th Cir. 1994).  Thus, to the extent Plaintiff seeks to base a § 1983 claim on this conclusory allegation in his brief, judgment is also proper on that claim.

In the context of a § 1983 suit, the term "supervisory liability" is a "misnomer," as each official is "only liable for his or her own misconduct." *Ashcroft v. Iqbal*, 129 S.Ct. 1983, 1949 (2009). Supervisory officials therefore cannot be held vicariously liable in § 1983 cases solely on the basis of vicarious or *respondeat superior* liability. *Monell v. Dep't of Social Servs.*, 436 U.S. 658, 693, 98 S. Ct. 2018, 2037 (1978); *Lozano v. Smith*, 718 F.2d 756, 768 (5th Cir. 1983). If a supervisor is not personally involved in the alleged constitutional deprivation, he may be held liable only if there is a sufficient causal connection between the supervisor's wrongful conduct and the constitutional violation in question. *Thompkins v. Belt*, 828 F.2d 298, 303–04 (5th Cir. 1987).

"It is facially evident that this test ***cannot*** be met if there is no underlying constitutional violation." *Rios v. City of Del Rio, Texas*, 444 F.3d 417, 425 (5th Cir. 2006) (emphasis added) (citing *Breaux v. City of Garland*, 205 F.3d 150, 161 (5th Cir. 2000) ("the fact that Plaintiff's First Amendment rights were not actually infringed exonerates [his supervisor] from supervisory liability"). For instance, in *City of Los Angeles v. Heller*, the United States Supreme Court held there is no precedent which

> authorizes the award of damages against a [supervisor] based on the actions of one of its officers when...the officer inflicted no constitutional harm. If a person has suffered no constitutional injury at the hands of the individual police officer, the fact that the departmental regulations might have ***authorized*** the use of constitutionally excessive force is quite beside the point.

475 U.S. 796, 799 (1986) (emphasis in original). In short, it is well-settled there can be no supervisory liability where there is not an underlying constitutional violation. *See Becerra v. Asher*, 105 F.3d 1042, 1047-48 (5th Cir. 1997); *Saenz v. Heldenfels Bros., Inc.*, 183 F.3d 389, 392-93 (5th Cir. 1999). Here, the Court has ruled that Plaintiff has failed to establish an underlying constitutional violation by Officer Boudreau. Thus, there can be no municipal or supervisory liability on the part of the City or Officer Deaton based on Officer Boudreau's actions.

Furthermore, as for any failure to train or supervise claim, such a claim requires that Plaintiff show: "(1) the supervisor either failed to supervise or train the subordinate official; (2) a causal link exists between the failure to train or supervise and the violation of the plaintiff's rights; and (3) the failure to train or supervise amounts to deliberate indifference." *Estate of Davis ex rel. McCully v. City of North Richland Hills*, 406 F.3d 375, 381 (5th Cir. 2005). This is a "stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." *Id.* To meet the stringent standard of deliberate indifference under this theory, Plaintiff must prove not only a pattern of violations, but also that the inadequacy of the training was obvious and obviously likely to result in a constitutional violation. *See id.*

As noted above, Plaintiff has not shown an underlying constitutional violation to which any failure to train, monitor, supervise, or punish could be causally linked, and thus his claim against the City and Officer Deaton must fail. But just as importantly, Plaintiff has also failed to provide any evidence of either a failure to train (the first requirement) or deliberate indifference on the part of the City or Officer Deaton to Plaintiff's constitutional rights (the third requirement) to create a triable fact issue. *See Estate of Davis*, 406 F.3d at 381.

First, with respect to the alleged failure to train, Plaintiff has not shown the training provided by APD was inadequate in any way. For liability to attach based on an inadequate training claim, a plaintiff must allege with specificity how a particular training program is defective. *Benavides v. Cty. of Wilson*, 955 F.2d 968, 973 (5th Cir. 1992). The Fifth Circuit has held "that if the training of police officers meets state standards, there can be no cause of action for a failure to train absent a showing that 'this legal minimum of training was inadequate to enable [the officers] to deal with the 'usual and recurring situations'" they would likely face. *O'Neal v. City of San Antonio*, 344 Fed. App'x 885, 888 (5th Cir. 2009)

-19-

(quoting *Benavides*, 955 F.2d at 973).  It is undisputed APD training exceeds state requirements for certification; officers receive 1,280 hours of Texas Commission on Law Enforcement Officer Standards and Education ("TCLEOSE") training, which far exceeds the minimum 618 TCLEOSE hours required for certification in Texas.[13]  *See* Def.'s Mot. Summ. J., Ex. 23 (affidavit of APD Chief of Police Arturo Acevedo) at ¶ 5.  All APD officers must be certified by TCLEOSE before they become APD officers, and must maintain their certification to remain APD officers.  *Id.*  Specifically, Officer Boudreau successfully completed all the written and practical tests at the APD training academy, received 1,280 TCLEOSE hours, and was certified by TCLEOSE prior to becoming a full-time APD officer.  *Id.* at ¶ 7.  As of 2009, he had 2,218 hours of TCLEOSE training and certification.  *Id.* at ¶ 9.  Because Plaintiff has presented no evidence APD's training requirements failed to meet state standards, or that the training was somehow deficient or inadequate—aside from his own conclusory allegations—the Court finds he has created no genuine issue of material fact on this issue.[14]

Secondly, with respect to the deliberate indifference prong, a plaintiff seeking recovery under a failure to train or supervise rationale must prove that the supervisor failed to control an officer's "known propensity for the improper use of force."  *Roberts v. City of Shreveport*, 397 F.3d 287, 292 (5th Cir. 2005).  The Court has scoured the record in this case and has found nothing in the record which even remotely suggests a prior pattern by Officer Boudreau of violating constitutional rights by using excessive force.  Far from establishing a pattern, the evidence shows Officer Boudreau had never had a sustained complaint of excessive force in the past, and had completed 2,218 hours of training (including training on the use of

---

[13]TCLEOSE is the Texas state agency responsible for certifying and licensing law enforcement officers in Texas.  Def.'s Mot. Summ. J., Ex. 23 at ¶ 5.

[14]Although Plaintiff does refer repeatedly to the affidavit of his expert witness, William Gaut, in his response, he does not indicate any specific testimony by Mr. Gaut which indicates APD's training requirements failed to meet state standards or that the training was somehow deficient or inadequate.  *See* Pl.'s Resp. at 9-11.

force).  *See* Def.'s Mot. Summ. J. at Exs. 1, 21-22.  "[A] showing of deliberate indifference is difficult, although not impossible, to base on a single incident."[15]  *Sanders-Burns v. City Of Plano*, 594 F.3d 366, 381 (5th Cir. 2010).  "Notice of a pattern of similar violations is required," and those prior acts must be "fairly similar to what ultimately transpired and, in the case of excessive use of force, ...must have involved injury to a third party."  *Id.*  In this case, Plaintiff presents no evidence of any prior use of excessive force by Officer Boudreau which involved injury to a third party, which would have made it clear more training was necessary.  Likewise, even if Officer Boudreau ***was*** habitually violating the rights of citizens by using excessive force (which is not even suggested by the evidence), there is absolutely no indication in the record that the City or Officer Deaton was on notice of such a pattern.  Therefore, Plaintiff cannot establish that any alleged failure to train or supervise on the part of the City or Officer Deaton reflected a deliberate or conscious choice to endanger the rights of citizens.

Therefore, on the basis of all the foregoing, the Court finds the claims against the City and Officer Deaton under § 1983 must fail as a matter of law, as no reasonable jury could conclude that the City or Officer Deaton acted with deliberate indifference to the rights of citizens with respect to the training or supervision of Officer Boudreau.[16]

Perhaps realizing he has failed to create a genuine issue of material fact as to any of his claims on summary judgment, Plaintiff seeks "[a]dditional time to investigate and conduct discovery regarding [his]

---

[15]The "single incident exception" is very narrow.  *Sanders-Burns v. City Of Plano*, 594 F.3d 366, 381 (5th Cir. 2010).  To rely on the exception "a plaintiff must prove that the highly predictable consequence of a failure to train would result in the specific injury suffered, and that the failure to train represented the moving force behind the constitutional violation."  *Id.*

[16]As to Plaintiff's claims the City violated his constitutional right to equal protection under the Fourteenth Amendment because its "custom pattern and practice for handling this situation is different in [Plaintiff's] neighborhood than in other neighborhoods," 2nd Am. Compl. at ¶¶ 13, 16, the Court dismissed these claims in full in order granting Defendants' motion to dismiss in part.  IN that order, the Court held, "Plaintiff's allegations about APD's alleged policy of using excessive force against minorities is a mere legal conclusion, without the slightest hint of further factual enhancement.  It does not give rise to a cognizable claim, and therefore is not sufficient to survive a motion to dismiss."  Dec. 2, 2009 Order [#38] at 11.  Plaintiff's ratification claim against Deaton and the City was likewise dismissed.  *Id.* at 15.

claims against the City" allegedly because "recent discovery has revealed that, rather than Officer Boudreau being improperly dispatched alone to Plaintiff's home (as initially understood at the time of Plaintiff's prior pleading), ...Boudreau was actually dispatched with a second officer, but failed to follow protocol regarding waiting for the second officer to arrive[.]" Pl.'s Resp. at 11.  Thus, Plaintiff requests additional time to conduct discovery regarding the need for more or different training in this area.  The Court notes Plaintiff has already ***twice*** requested extensions of the original scheduling order (which itself was based on dates submitted by Plaintiff).  *See* Request for Ext. [#45]; 2ⁿᵈ Request for Ext. [#50].  Both requests were granted by the Court, such that the discovery deadline has now been extended by over seven months from the original deadline, and Plaintiff has now been conducting discovery on a relatively simple excessive force case for a full ***fifteen*** months.  *See* Orig. Sched. Order [#14]; Revised Sched. Order [#52].

Plaintiff presents no convincing reason why the Court should further delay resolution of this matter. Importantly, Plaintiff does not set forth any specific item or information he is waiting to receive in discovery, any specific discovery request which has not been responded to sufficiently by the City, or any deposition which remains to be taken.  His statements about the need for a continuance are wholly vague and conclusory.  Furthermore, the only claims on which he seeks further discovery are his supervisory claims against the City, which the Court has already found cannot survive summary judgment for the simple reason that Plaintiff has not created a genuine issue of material fact as to the existence of an underlying constitutional violation in this case.  There is no reason to conduct additional discovery on a claim upon which it is clear Plaintiff cannot prevail.  Plaintiff's request for continuance of the summary judgment ruling as to his claims against the City of Austin is therefore DENIED.

**II.    Defendants' motion to exclude testimony of Plaintiff's experts [#70]**

Defendants seek to exclude the testimony of William Gaut, Plaintiff's expert.  Because Plaintiff's claims have been dismissed in their entirety, the motion is hereby DISMISSED as moot.

**III.    Defendants' motion to strike response in opposition (Docket No. 68) [#72]**

In this motion, Defendants object to various pieces of evidence offered by Plaintiff in its response to Defendants' motion for summary judgment.  Because the Court has granted Defendants' motion for summary judgment in its entirety, the instant motion is DISMISSED as moot.

**IV.    Plaintiff's motion to strike summary judgment evidence contained in Defendants' reply to response (Docket No. 71) [#76]**

In this motion, Plaintiff seeks to strike evidence—specifically, a transcript of the enhanced audio from Officer Boudreau's lapel microphone—which he claims was introduced by Plaintiff for the first time in its reply to Plaintiff's response to the motion for summary judgment.  The Court did not consider the transcript in any way in ruling on the motion for summary judgment, and therefore Plaintiff's motion to strike is DISMISSED as moot.

**V.    Defendants' motion to strike response in opposition to motion (Docket #74) [#80]**

Finally, Defendants request the Court strike Plaintiff's sur-reply to Defendants' motion for summary judgment.  Defendants are correct that once a response and a reply to a motion have been filed, "[a]bsent leave of Court, no further submissions on the motion are allowed." Local Rule CV-7(e).  However, because

the Court has granted Defendants' motion for summary judgment in its entirety, the instant motion is DISMISSED as moot.

## Conclusion

In accordance with the foregoing,

IT IS ORDERED that Defendants' motion for summary judgment [#61] is GRANTED.

IT IS FURTHER ORDERED that Defendants' motion to exclude testimony of Plaintiff's experts [#70] is DISMISSED AS MOOT.

IT IS FURTHER ORDERED that Defendants' motion to strike response in opposition (Docket No. 68) [#72] is DISMISSED AS MOOT.

IT IS FURTHER ORDERED that Plaintiff's motion to strike reply to response (Docket No. 71) [#76] is DISMISSED AS MOOT.

IT IS FINALLY ORDERED that Defendants' motion to strike response in opposition to motion (Docket #74) [#80] is DISMISSED AS MOOT.

SIGNED this the 4th day of August 2010.

_____
SAM SPARKS
UNITED STATES DISTRICT JUDGE